# BARBER ASPHALT PAVING COMPANY

*vs.*

## EDWIN A. POE ET AL., RECEIVERS.

*Corporate Receivers—Effect of Appointment—Surety Company—Procurement of New Bond.*

The mere appointment of receivers for a corporation, without any declaration or adjudication of insolvency, or decree of dissolution, does not terminate liability on its contracts.

pp. 335, 336

That receivers have been appointed for a surety company does not, in itself, entitle the principal on a bond, on which the company is surety, to claim the amount of unearned premiums paid by such principal to the company. pp. 334-337

Under Rule 20 of the Court of Appeals, providing that when a case has been in that Court, there shall be copied into the transcript, upon any subsequent appeal, only the proceedings occurring in the court below subsequent to the former appeal, the Court of Appeals may, in considering a claim against receivers, consider facts appearing in the court records in former cases in connection with the same receivership. p. 338

It appearing that the receivers of a surety company had advised persons secured by bonds of the company to obtain other bonds in lieu of and in substitution for the bonds of the company, so as to relieve it of liability as surety, *held* that a paving company which thereafter gave new "maintenance" bonds to a city in place of bonds of the surety company, thereby relieving the latter of liability, was entitled to claim in the receivership proceedings the amount paid out in procuring such new bonds. pp. 338-340

*Decided June 29th, 1921.*

Appeal from the Circuit Court of Baltimore City (HEUISLER, J.).

Claim by the Barber Asphalt Paving Company against Edwin W. Poe and others, Receivers of the United Surety Company. From a decretal order disallowing the claim, the claimant appeals. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS. and OFFUTT, JJ.

*L. B. Keene Claggett,* with whom were *Bartlett, Poe & Claggett* on the brief, for the appellant.

*Frank B. Ober,* with whom were *Janney, Stuart & Ober* on the brief, for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The Barber Asphalt Paving Company filed a claim before the auditor for $3,141.99 for unearned premiums on bonds on which the United Surety Company was surety. It was disallowed by the auditor, and the Circuit Court of Baltimore City sustained him. This appeal was taken from the decretal order of that court, in so far as it disallowed said claim.

The United Surety Company was on a large number of construction and maintenance bonds, given by the appellant to the City of Chicago for paving streets in that city, the most of them having been given in 1906, and some covered a period of ten years and others five years. On February 17, 1913, at the request of the city, the appellant gave new bonds, with the United States Fidelity and Guaranty Company as surety on thirty-seven out of sixty odd, on which the United Surety Company was originally surety. The cost to the appellant of the new bonds was $633.75, but it contends that it is entitled to the amount of unearned premiums on the bonds for which the new ones were given, which it says is a sum stated in the claim filed by it. What are called "construction and maintenance" bonds were given by the con-

tractor to secure the obligee (City of Chicago) for the performance of the contracts for the construction of the work, and then for its maintenance for the period agreed upon—in this case five and ten years.

The receivers contend (1) that the evidence does not show that the United Surety Company was released from its obligation, and hence no unearned premiums could be recovered, and (2) if that be not correct, that there can in no event be a recovery for more than $633.75, the amount paid by the appellant for the new bonds. They also contend that the appellant was not required to give the new bonds, and, as it was voluntary on its part in doing so, it cannot recover the latter sum, even if the position taken by then under what we have marked (1) be not sustained.

We will first consider what we have marked (2) above, as we think the appellant is not entitled to more than it actually paid out for the new bonds. There is a clear distinction between this case and the *Casualty Insurance Company's Case,* 82 Md. 535. That company had been adjudicated to be insolvent, and the Court was dealing then with such a company, while the United Surety Company had not prior to the time the new bonds were given been declared to be insolvent, but on the contrary it was confidently believed by the receivers, for some time after they were appointed, that it was solvent, and possibly might be able to resume business. In the case of *Vandiver* v. *Poe,* 119 Md. 348, decided January 14th, 1913, we reversed an order of the lower court requiring the State Treasurer to turn over to the receivers the $100,000 of registered stock of the City of Baltimore—that sum being required to be deposited by such a company by our statutes—and another $100,000 of similar stock, which the company had deposited with the State Treasurer, to meet the requirements imposed by the laws of some other states in which the company desired to do business. We said: "We can find no sufficient warrant in the statute, or in the condition of the company as it now exists, to justify the turning

over at this time to the receivers of a solvent corporation, securities which have been placed in the hands of a trustee for a specific trust purpose, and with beneficiaries scattered in a large number of states." The Court referred to the fact that the solvency of the company in question was not merely alleged in the bill under which the receivers had been appointed, but had been reiterated time and time again by the receivers in various papers filed by them, and was testified to by one of them. In the case of *United States* v. *Poe,* 120 Md. 89, the Court pointed out some of the differences in the application of principles to be applied to the payment of, or distribution among, the creditors of insolvent corporations, from such a one as the United Surety Company, which had not been declared or decreed to be insolvent. It said that the effect of a decree of dissolution, or of an adjudication of insolvency, was undoubtedly to determine the outstanding contracts of the company, operating between the company and its creditors, as does the death of an individual between himself and his creditors. In the *Casualty Company's Case,* on page 569 of 82 Md., it had been said that: "The insolvency of the company cancelled all outstanding policies of insurance for the future." Again, on page 570, it was said: "If the accidents, which form the basis of the claims now made for indemnity, happened *after* the insolvency was declared, then, inasmuch as the insolvency cancelled the policies, there can be no claim under the policies, but as the company by its insolvency committed a breach of its contracts, the policyholders thereupon became entitled to damages for that breach, and these damages are the values of the destroyed policies. The policies being thus destroyed, of course, all liability under them, from the date of the insolvency, for accidents occurring subsequently to the insolvency, ceased, consequently losses which happened after the insolvency under policies in existence at the date of the insolvency, are not provable against the funds in the receivers' hands. Whilst this is so, the values of the destroyed policies *are* provable, and ac-

cording to well-settled rules, these values consist solely of the unearned or return premium."

CHIEF JUDGE McSHERRY was then speaking of a corporation which had been declared insolvent. In the case of the United Surety Company, the first time the court said it was insolvent, so far as has been brought to our attention, was on February 25th, 1921, according to a copy of a decree filed by agreement of the solicitors—it being recited in the decree for the sale by the Treasurer of the $200,000 of stock of the City of Baltimore. The decree goes on to say: "And it appearing to the Court that the property of the United Surety Company is insolvent, and that there are no assets in the hands of the receivers sufficient to pay claims allowed against the property by the Auditor's report," etc. It is true that the company was unable to issue new policies shortly after the receivers were appointed, and was prohibited from doing so in some states until it restored the surplus and capital which had been lost by bad management, and of course, after the company went into the hands of receivers, it could not be expected that it could get new business, unless its stockholders or others came to its relief and put it on a proper basis, but nevertheless it had not been declared insolvent, and proceedings had not been taken for its dissolution. As conditions existed when the new bonds were given, it could not be said that the United Surety Company would not be able to meet demands on it in case of default of its principal. There is no evidence that there was any default by the principal for the periods covered by the bonds. It would, therefore, seem to be clear that the appellant should not be permitted to recover more than it was required to pay for the new bonds, even if it had a valid reason for entering into them.

It is said that the amount thus paid out by the appellant was less than what it had been required to pay the United Surety Company, because it did not enter into as many bonds, and made a special arrangement with the United States Fi-

delity and Guaranty Company, but when the new bonds were entered into by the appellant (February 17th, 1913) there could no longer have been much, if any, liability on the part of the United Surety Company for construction, and the time for which it was held for maintenance had wholly expired, in many of them, those given in 1906 to cover a period of five years, and the ten-year bonds were to expire in three or four years—all but one of them, which was given in 1907, having been given in 1906. If there had been default in any of them prior to February 17th, 1913, it is not shown, and, of course, any claim for such default would have been made on a different ground from that now being contended for. Indeed, it does not appear that there was any default on any of them during either the five or ten year periods.

Of course, we do not mean to in any way disturb or modify the general rule in reference to the ascertainment of unearned premiums, but, under the circumstances of this case, it would be very inequitable and unjust to allow the appellant's claim for $3,141.99, when it only had to pay $633.75 to place it exactly in the same position it was in before with its employer, the City of Chicago. During the period between January 13th, 1911, the date of the receivership, and the time it gave the new bonds, there can be no question about the liability of the United Surety Company still continuing. The City of Chicago had no other security against default of the appellant, and yet the claim of the appellant is calculated from January 13th, 1911. Manifestly that could not be right, as the United Company was still legally responsible to the City of Chicago, and, according to appellant, also liable to it for unearned premiums. The bonds were not given to secure the appellant from loss, but to secure the city from the appellant's default, if there was any. If it had defaulted in its contracts, or any of them, it would have made no pecuniary difference to the appellant, whether or not the city could recover from the United Company. So it seems to us clear that the most the appellant could ask of the receivers is to

allow its claim for what the condition of the United Company caused it to pay out.

The contract clerk of the appellant testified "that the City of Chicago, in order to secure these new bonds, allowed us to substitute a bond in a smaller amount. This was in the nature of a compromise with the City of Chicago, because there was nothing in their contract which would compel us to substitute a new bond in place of the old one, but in order to keep in good standing with the city, of course, we had to file these new bonds." That presents the inquiry as to whether the appellant has the right to ask to be reimbursed for the amount it thus paid out, and while it reflects upon the question we have been considering, it is also connected with the other branch of the case we suggested above—that the giving of a new bond did not release the United Company from its obligations, and hence no recovery can be had. But our records in former cases in connection with this receivership show facts that we must notice, and have the right to take into consideration, under Rule 20 of this Court relating to appeals, and authorities which might be cited. In the *Vandiver Case (supra)* the report of the receivers, filed January 19th, 1912, shows that they had been endeavoring to have the outstanding bonds and policies of the United Company relieved of further liability in different ways, amongst others by substitution of other bonds, and their instructions to agents of the company had shown that they were desirous of doing so, and referred to the authority from the Circuit Court of Baltimore City to settle unearned premium claims. It referred to a letter they had sent out, enclosing a copy of an order of the court, passed on December 21st, 1911, requiring new bonds to be given in lieu of and substitution for those of the United Surety Company in that court, and directing the receivers to send to other courts in and beyond this state a list of all bonds of the United Company in said courts, together with a statement that the United Company was "in 'process of liquidation' and is not prepared to furnish that

protection in the quick payment of losses that parties accepting its bonds as a going concern would be entitled to expect, and respectfully suggesting to the honorable judges of the said courts the propriety of requiring the parties so bonded to file new bonds therein in lieu of and in substitution for the bonds of the United Surety Company." There is other evidence tending to show that the receivers, as well as the learned judge who had charge of the receivership, took active and proper precautions to advise parties interested of what they believed to be the real condition of the United Company, and to show that they were desirous of having it relieved of future liability by thus obtaining new sureties and relieving the United Company.

The form of the bonds given by the appellant on February 17th, 1913, is in the record, and in the preamble it was recited that "Whereas, The United Surety Company has had receivers appointed and its financial condition is such that the said City of Chicago has requested that the above-named principal execute a new surety bond wherein shall be substituted in place of the United Surety Company, a satisfactory surety * * *; and Whereas, The United States Fidelity and Guaranty Company has offered to become surety and does hereby become surety in place of the United Surety Company by the execution of this bond." It is said on behalf of the receivers that the conclusion of the bond indicates that it was not to release the United Surety Company, but we do not understand that it was intended to continue both obligations. While, of course, the letter of the president of the board of local improvements of the City of Chicago to the appellant, dated February 17, 1914, which concludes by saying that "this releases the United Surety Company and its receivers from any further liability in these cases" would not necessarily be conclusive, it does show what his understanding was, and when taken in connection with the effort of the receivers to have that very thing done, we do not see how the appellant or the City of Chicago could ever claim

that the United Surety Company's bonds were still in force. Without discussing the rules of law as to novation, we do not think that the receivers are in a position to contend that the new bonds were given without their consent, and it would be manifestly inequitable not to allow the appellant's claim to the extent it actually paid with a view to substitute a new surety and release the old one. We are of the opinion, therefore, that the claim, not exceeding $633.75, should be allowed.

It follows that the decretal order of January 7th, 1921, must be reversed in so far as it disallows that much of the appellant's claim, but as it contended for the whole of its claim filed and compelled the receivers to contest its claim for the whole amount, we will require the appellant to pay the costs.

> *Decretal order of the 7th day of January, 1921, reversed in so far as it disallowed $633.75 of the appellant's claim filed, the appellant to pay the costs.*